*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* BULLARD, Minors.

UNPUBLISHED
March 23, 2023

No. 362065
Wayne Circuit Court
Family Division
LC No. 2021-000703-NA

Before: MURRAY, P.J., and RIORDAN and YATES, JJ.

PER CURIAM.

Respondent appeals as of right the trial court's order terminating his parental rights to the minor children, CGB and DMB, under MCL 712A.19b(3)(g) (failure to provide proper care and custody) and (j) (reasonable likelihood of harm if returned to parent).[1] Respondent pleaded no contest to the jurisdictional allegations in the petition and the statutory grounds for termination. A separate best-interests hearing was held. The trial court found that termination of respondent's parental rights was in the children's best interests. MCL 712A.19b(5). On appeal, respondent contends that the evidence was not sufficient to establish jurisdiction or support a finding of clear and convincing evidence on the statutory grounds for termination. Respondent further argues that the trial court clearly erred by terminating his parental rights at the initial disposition without offering services for reunification because there were no aggravated circumstances to support termination at the initial disposition. Finally, respondent contends that the trial court clearly erred by finding that termination of respondent's parental rights was in the children's best interests and when it failed to determine the best interests of each child individually. Finding no merit to respondent's arguments, we affirm.

## I. FACTS AND PROCEEDINGS

On May 1, 2021, CGB's mother (the mother) filed a police report (Inkster Police report), which stated that, on April 29, 2021, respondent became angry because he did not think the mother moved fast enough when he told her to leave. He struck her in the face multiple times with a closed fist, pulled her by her hair, and then took her spare set of car keys. The next day, she

---

[1] The parental rights of the mother were not terminated and she is not a party to this appeal.

witnessed respondent steal her vehicle. On May 20, 2021, CGB was in the car with respondent and the mother, who was nine weeks pregnant, when an argument occurred between respondent and the mother, which ended when respondent shot the mother. Medical records from Beaumont Dearborn Hospital confirmed the gunshot wounds and the pregnancy. The medical records showed that the mother was shot at least five times. There was one gunshot wound to her right lower abdomen, one gunshot wound to her groin, and three gunshot wounds to her right sternum. The mother told conflicting stories at the hospital and to the police, but eventually confessed to the police that she and respondent were arguing in the car, and when respondent got out of the car, he pulled his gun and shot her twice from the passenger side of the car. On July 30, 2021, respondent admitted to a Child Protective Services (CPS) worker that he had an unregistered handgun in the car the night of the incident and did not have a license to carry the firearm. He further told the CPS worker that he and the mother got into a verbal altercation in the car on the way to drop him and CGB off at the paternal grandmother's home. As he was getting out of the car and gathering his belongings, he handed the mother the gun to hold. When he attempted to retrieve the handgun, he believed the mother "unknowingly pulled the trigger and was shot." The mother drove off as he attempted to help her.

The police charged respondent with several crimes as a result of the shooting. However, because the mother did not want to pursue any charges against respondent and did not show up for the criminal hearings, the criminal charges against him were dropped.

On August 13, 2021, the Department of Health and Human Services (DHHS) filed a petition for permanent custody, jurisdiction, and removal of CGB and the mother's other child.[2] The petition sought termination of respondent's parental rights on the basis of the domestic violence incidents and shooting. Removal was sought pursuant to MCL 712A.2(b)(2) (neglected/refused to provide proper care, and children were at a substantial risk of harm to their mental well-being) and (b)(3) (the home, because of neglect, cruelty, drunkenness, criminality, or depravity, is unfit for the children), and the petition alleged that CGB was at risk of harm in respondent's care. At the preliminary hearing, the trial court found that respondent's behavior had "escalated to the highest form of domestic violence" because it involved a weapon, and he had shot "his unborn child's mother in the presence of his son." CGB was placed with the DHHS, which placed him in the home of the maternal grandmother, where the mother was also living. The trial court ordered that respondent shall have no contact "whatsoever" with any of his children, including being present at the birth of the unborn baby, and must not be within 500 yards of them.

DMB was born on December 12, 2021, and a new permanent custody petition regarding DMB was filed on January 31, 2022. Petitioner requested that the trial court authorize the petition, exercise jurisdiction over DMB, and place her with the mother in the home of the maternal grandmother, with supervised visitation for the mother. The petition requested that, on the basis of the same facts alleged against respondent in the initial petition, that respondent's parental rights to DMB be terminated.

At a hearing on February 3, 2022, respondent waived his right to a contested trial on the allegations in both petitions and pleaded no contest to the jurisdiction allegations and the statutory

---

[2] That child is not respondent's child and is not involved in these proceedings.

grounds for termination. The parties stipulated to a separate best-interests hearing and a Clinic for Child Study (CCS) report on the best interests. The parties also stipulated that the criminal charges had been dismissed. The factual basis for respondent's admissions and no-contest plea was the Inkster Police report and the mother's certified medical records. Following respondent's no-contest plea, the trial court exercised jurisdiction over the children and found that there was clear and convincing evidence to support the statutory grounds for termination.

The best-interest hearing was held on March 14, April 11, and May 18, 2022. A CPS supervisor testified that the DHHS believed that termination of respondent's parental rights was in the best interests of the children because of respondent's escalating domestic violence, which culminated in the "most egregious" shooting of the mother multiple times while she was pregnant and in front of their one-year-old child. The DHHS believed that the children would be at risk of harm with respondent, and that services would not rectify the risk of harm to the children.

A CCS forensic family clinician interviewed respondent on March 4, 2022, to evaluate him and write a report, the CCS report, for the court's consideration regarding best interests. She had reviewed the records in respondent's case, including the Inkster Police report and the certified medical documents, and understood that respondent had shot the mother of his children. He told the clinician that "the gun went off," but he did not say who caused the gun to go off. It was more, "this happened, it was an accident." The clinician thought that he was very "matter of fact" about the shooting, did not think it was a "big deal," and that everyone should just get over it and move on. The clinician stated that respondent showed no concern or remorse for the victim. She thought that respondent was evasive, dishonest, and deceptive. For example, when she asked respondent about his history of domestic violence, respondent denied that he had a history of domestic violence. On the basis of the records that she had received and reviewed, she knew that respondent's denial was not truthful. Therefore, she did not ask him about the domestic violence incident in the Inkster Police report.

The mother, who was the victim of the shooting, testified that respondent had been a good father to CGB and her other child, provided financial support, and had never harmed the children. She believed that it would be traumatic if CGB never saw respondent again. She also believed that the shooting was an accident and not intentional. She was in the driver's seat and CGB was in the back seat behind her. She said that she was reaching for the firearm when respondent was trying to get out of the car. She testified that she was shot only once and the other three holes in her abdomen were from the one bullet ricocheting. She testified that she told conflicting stories because she was afraid of getting into trouble. She was not afraid of respondent. However, on cross-examination, she was surprised to learn that respondent had spent time in prison for a stabbing. She acknowledged the facts in the Inkster Police report. She agreed that the children would not be safe in the presence of the kind of behavior that respondent had exhibited. She was not happy to learn that the criminal charges had been dismissed because she did not appear for the proceedings.

The maternal grandmother, who had custody of the mother's three children, testified that she knew the mother had been shot because she had received a call from the State Police informing her, but she did not know the circumstances of the shooting. The mother had never told her about any violence in the relationship. At the time of the hearing, however, the maternal grandmother was concerned about respondent being with the children.

Finally, respondent's mother, the paternal grandmother, testified that whenever she saw respondent with the children, it was always a loving situation. She had never observed an argument or altercation between respondent and the mother. She believed that this case had been a learning situation for respondent. She saw a strong bond between respondent and CGB and believed that being a parent had made respondent a better person. The paternal grandmother knew that there had been a shooting, but she had never been informed that respondent was responsible. She was told "that a gun went off." Respondent told her that it was an accident.

Following the testimony and the parties' arguments, the trial court found that the mother and the child could have died if the gun had been pointed just an inch in a different direction and concluded that the risk of harm posed by respondent was so high that there was no service that respondent could complete that could assure the trial court that the children would be safe around him. The trial court found that, despite relative placement, the risk of harm was too high. In the order following the hearing to terminate parental rights, the trial court stated: "[I]t is in each child's best interests to terminate [respondent]'s parental rights due to the extreme danger he posed to his children."

## II. JURISDICTION, STATUTORY GROUNDS, AND AGGRAVATED CIRCUMSTANCES

First, respondent contends that the evidence was not sufficient to establish jurisdiction by a preponderance of the evidence or support a finding of clear and convincing evidence on the statutory grounds because the evidence showed that the shooting was not an intentional act. This issue is waived.

Respondent entered a no-contest plea to the statutory grounds for termination. The plea indicated that respondent was directly and intentionally responsible for placing the mother and children in serious danger by gunfire. Therefore, respondent's argument is directly contrary to his plea of no contest and the issue is waived. See *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011). "Respondent may not assign as error on appeal something that [he] deemed proper in the lower court because allowing [him] to do so would permit respondent to harbor error as an appellate parachute." *Id*. See also *Holmes v Holmes*, 281 Mich App 575, 588; 760 NW2d 300 (2008) ("A party cannot stipulate a matter and then argue on appeal that the resultant action was error.") (quotation marks and citation omitted).

Respondent next contends that the trial court erred by terminating his parental rights at the initial disposition because reasonable efforts toward reunification must be made in all cases except if the court finds aggravated circumstances, and respondent contends the evidence did not rise to the level of aggravated circumstances. Therefore, he argues, he should have been provided with services. See *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010) (explaining that "reasonable efforts to reunify the child and family must be made in all cases except those involving aggravated circumstances") (cleaned up).

Absent aggravated circumstances, the DHHS "has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *In re Hicks/Brown*, 500 Mich 79, 85; 893 NW2d 637 (2017). Aggravated circumstances are defined in MCL 722.638(1)(a), which provides that aggravated circumstances exist when a parent has "abused the child. . . and the abuse included 1 or more of the following":

(*i*) Abandonment of a young child.

(*ii*) Criminal sexual conduct involving penetration, attempted penetration, or assault with intent to penetrate.

(*iii*) Battering, torture, or other serious physical harm.

(*iv*) Loss or serious impairment of an organ or limb.

(*v*) Life threatening injury.

(*vi*) Murder or attempted murder. [MCL 722.638(1)(a)(*i*)-(*vi*).]

Further, MCL 712A.19a(2) provides, in relevant part:

> The court shall conduct a permanency planning hearing within 30 days after there is a judicial determination that reasonable efforts to reunite the child and family are not required. Reasonable efforts to reunify the child and family must be made in all cases except if any of the following apply:
>
> (a) There is a judicial determination that the parent has subjected the child to aggravated circumstances as provided in section 18(1) and (2) of the child protection law, 1975 PA 238, MCL 722.638. [MCL 712A.19a(2)(a).]

Arguably, respondent waived this issue by entering his no-contest plea. Respondent's contention that reasonable services were not offered relates to the sufficiency of the evidence for aggravated circumstances. Because respondent entered a no-contest plea to the statutory grounds, his argument is seemingly contrary to his plea of no contest. See *Hudson*, 294 Mich App at 264.

More importantly, the record shows that services were offered to respondent, but he declined them because he had already started services on his own. Thus, this issue is waived for that reason as well.

Following his no-contest plea, respondent raised the issue that he be permitted visitation. The trial court remarked that the therapist had recommended that respondent engage in services for anger management, domestic violence, and therapy before there would be a review of visitation. The trial court stated that it "would be happy" to order those services for respondent "right now." Respondent's attorney replied that respondent was already engaged in services. Respondent was then sworn in and testified that he was receiving services through Hegira in Westland. He had started those services within the last month and his counseling sessions were scheduled around availability. He testified that he was enrolled for mental health, which included anger management, but did not address domestic violence. He would inquire if they could include that service, and, he was open for other recommendations for services. The trial court then stated:

> I would include in today's Order those services that are outlined in that letter from the therapist for [respondent]. It sounds like a lot of them are in place already, but there's got to be progress, measurable progress in those services and I'm going to require therapist approval before there's any contact.

-5-

The trial court also ordered a CCS evaluation. In the adjudication order following the hearing, the trial court ordered reasonable efforts "shall be made to preserved and reunify the family." The worker requested the records from Hegira. Those records were received and admitted into the record at the best-interests hearing.

Respondent waived any issue of services when he declined the trial court's offer to order services. See *Hudson*, 294 Mich App at 264. The trial court did not need to make any judicial determination regarding services. It had offered services to respondent. Respondent had declined the offer on the record because he had already sought services from Hegira outside of the court's jurisdiction. The record further reveals that respondent's involvement in outside services and the records of that involvement were clearly explained and made part of the record. Respondent's argument on appeal is directly contrary to his on-the-record statements declining the offer of court-ordered services. "Respondent may not assign as error on appeal something that [he] deemed proper in the lower court because allowing [him] to do so would permit respondent to harbor error as an appellate parachute." *Id*.

## III. BEST INTERESTS

Finally, respondent argues that the trial court clearly erred in finding, pursuant to MCL 712A.19b(5), that termination of his parental rights was in the best interests of the children. He contends that none of the witnesses offered any testimony to support the trial court's findings. We disagree.

MCL 712A.19b(5) provides:

> If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made.

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). The trial court's ruling regarding best interests is reviewed for clear error. *In re Schadler*, 315 Mich App 406, 408; 890 NW2d 676 (2016). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *Moss*, 301 Mich App at 80 (quotation marks and citation omitted).

The trial court must weigh the evidence available on the whole record in determining the child's best interests. *In re White*, 303 Mich App 701, 713-714; 846 NW2d 61 (2014). It may consider such factors as "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *Olive/Metts*, 297 Mich App at 41-42 (citations omitted). Other considerations include the length of time the child has been in foster care or placed with relatives, the likelihood that "the

child could be returned to her parent's home within the foreseeable future, if at all[,]" and compliance with the case service plan. *In re Frey*, 297 Mich App 242, 248-249; 824 NW2d 569 (2012). In addition, the trial court may also consider a parent's history of domestic violence and the parent's visitation history. *White*, 303 Mich App at 713-714. In *Moss*, 301 Mich App at 89, this Court explained:

> [O]nce a statutory ground for termination is established, i.e., the parent has been found unfit, the focus shifts to the child and the issue is whether parental rights should be terminated, not whether they can be terminated. Accordingly, at the best-interest stage, the child's interest in a normal family home is superior to any interest the parent has. [*Id*. (emphasis omitted).]

In support of his argument, respondent presents only selective testimony given by the mother and maternal grandmother that respondent was a good father and that they never saw any inappropriate behavior or parenting from respondent. However, once the mother and maternal grandmother were presented with the actual facts of the shooting at the hearing, their attitudes changed. The mother agreed that it was not safe for her children to be around respondent "with this kind of behavior," and then qualified her statement that she thought the children would be safe with respondent by adding, "if he completed his treatment thing and showed . . . improvement." The maternal grandmother realized that she had not been told the truth about the shooting. She testified that she did not know the circumstances or that respondent had a weapon. Having learned about the shooting and the earlier violence that was revealed in the Inkster Police report, the maternal grandmother was now concerned about respondent being with the children.

We acknowledge that respondent's mother testified positively on his behalf. However, during cross-examination, it became clear that respondent had not been honest with his mother. She testified that she knew that there had been a shooting, but she was never told that respondent "did it, I was informed that a gun went off." Respondent's mother realized that she did not receive "all the details." Respondent had told her it was an accident. This testimony clearly showed that respondent had not been truthful about the incident.

The record contains sufficient testimony to support the trial court's decision. In addition to the certified medical records and the Inkster Police report, the testimony of the foster care specialist, the CPS supervisor, and the CCS forensic family clinician clearly supported a finding that termination of respondent's parental rights was in the best interests of the children by a preponderance of the evidence. Specifically, respondent had a history of domestic violence, threatened the lives of the mother and his children by discharging a firearm at or near them in a closed area, and apparently refused to accept any responsibility for that incident. Instead, respondent told others implausible stories about the shooting being a mere accident. Given his unwillingness to even admit his wrongdoing in that regard, we agree with the trial court that there are no assurances that the children "would be safe around [respondent]" in the future.

Next, respondent argues that the trial court clearly erred when it failed to determine the best interests of each child individually. In *Olive/Metts*, 297 Mich App at 42, this Court held that "the trial court has a duty to decide the best interests of each child individually." In termination cases, each child must be treated as an individual and it is "incumbent on the trial court to view each child individually when determining whether termination of parental rights is in that child's

best interests." *Id*. However, in *White*, 303 Mich App at 715-716, this Court distinguished the facts in *Olive/Metts*, by stating that, in *Olive/Metts*:

> [T]he trial court clearly erred by failing to distinguish between two groups of children—the younger children, who were placed with relatives, and the older children, who were not. . . . The younger children's placement with relatives was a significant basis for distinguishing them from the older children because a trial counsel must address a child's placement with realities.
>
> We conclude that this Court's decision in *In re Olive/Metts* stands for the proposition that, if the best interests of the individual children significantly differ, the trial court should address those differences when making its determination of the children's best interests. It does not stand for the proposition that the trial court errs if it fails to explicitly make individual and—in many cases—redundant factual findings concerning each child's best interests. [Cleaned up.]

In this case, the trial court did not address each child individually on the record. However, given that CGB and DMB were similarly aged and situated with respect to respondent, their interests did not significantly differ. Any bond that existed between respondent and CGB was clearly outweighed by the risk of harm presented by respondent, as demonstrated by the fact that respondent shot the mother five times while CGB was in the back seat of the car and pregnant with DMB. There was absolutely no bond between respondent and DMB, who was approximately five months old at the time of the best-interests hearing and never had contact with respondent. The interests of both children were the same—to live in a safe environment absent violence, dissention, and risk of harm. Both children were in the home of the maternal grandmother where the mother resided, and there was no evidence that the mother's parental rights were terminated. Therefore, adoption was not a consideration. The trial court did not clearly err. It spoke of each child in its termination order and, in any case, there was not a significant difference between each child's best interests.

## IV. CONCLUSION

There were no errors warranting relief. We affirm.

/s/ Christopher M. Murray
/s/ Michael J. Riordan
/s/ Christopher P. Yates